UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMIE A. BENTLEY-CLEARWOOD,

                Plaintiff,           Civil Action No. 18-cv-12270
                                        Honorable Mark A. Goldsmith
                                        Magistrate Judge David R. Grand

v.

NANCY A. BERRHILL,
Acting Commissioner of Social Security,

                Defendant.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17] AND DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [15]

Plaintiff Jamie A. Bentley-Clearwood ("Bentley-Clearwood") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #15, #17), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I. RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Bentley-Clearwood is not disabled under the Act is supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment (**Doc. #17**) be **GRANTED,** that Bentley-Clearwood's Motion for Summary Judgment (**Doc. #15**) be **DENIED**, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the **ALJ's** decision be **AFFIRMED.**

1

**II. REPORT**

**A. Background**

Bentley-Clearwood was 47 years old at the time of her alleged onset date of January 15, 2016 (amended at the hearing to April 7, 2016 (Tr. 41)), and at 5'4" tall weighed approximately 171 pounds. (Tr. 26, 45). She completed three years of college and, prior to filing her instant application for DIB, had most recently worked as a customer service representative. (Tr. 45, 56-57). This role encompassed the responsibilities of an ordering clerk and required her to lead conference calls or conduct online communications with suppliers and engineers. (Tr. 57). She alleges disability primarily as a result of depression and anxiety. (Tr. 46-47).

After Bentley-Clearwood's application for DIB was denied at the initial level on August 22, 2016 (Tr. 65), she requested an administrative hearing, which was held on December 13, 2017, before ALJ Dennis Matulewicz. (Tr. 31-64). Bentley-Clearwood, who was represented by attorney Gregory Frye, testified at the hearing, as did vocational expert Cheryl Mosley. (*Id.*). On January 25, 2018, the ALJ issued a written decision finding that Bentley-Clearwood is not disabled under the Act. (Tr. 17-27). On May 24, 2018, the Appeals Council denied review. (Tr. 1-6). Bentley-Clearwood timely filed for judicial review of the final decision on July 19, 2018. (Doc. #1).

The Court has thoroughly reviewed the transcript in this matter, including Bentley-Clearwood's medical record, Function and Disability Reports, and testimony as to her conditions and resulting limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

**B. The ALJ's Application of the Disability Framework Analysis**

Under the Act, DIB are available only for those who have a "disability." *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps.... If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Bentley-Clearwood is not disabled under the Act.  At Step One, the ALJ found that Bentley-Clearwood has not engaged in

substantial gainful activity since January 15, 2016. (Tr. 19). At Step Two, the ALJ found that she has the severe impairments of obesity, asthma, essential hypertension, chronic obstructive pulmonary disease (COPD), affective disorder/depression, and anxiety disorder. (Tr. 20). At Step Three, the ALJ found that Bentley-Clearwood's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (*Id*.).

The ALJ then assessed Bentley-Clearwood's residual functional capacity ("RFC"), concluding that she is capable of performing light work, with the following additional limitations: she cannot use ladders or scaffolds; she must avoid concentrated exposure to extreme heat, cold, wetness, humidity, vibrations, fumes, odors, dust, gases, and poor ventilation; and she cannot work with hazards including dangerous/unprotected machinery or work at unprotected heights. (Tr. 21). She is limited to simple, unskilled work with a specific vocational preparation ("SVP") of one or two with occasional contact or discussion with coworkers or the general public; limited to routine work that does not require changes or adaptations in work settings or general duties more than once per month; and limited to jobs without production quotas mandating a specific number of pieces per hour, or with a down line coworker depending on her productivity. (*Id*.). At Step Four, the ALJ concluded, based in part on testimony provided by the vocational expert ("VE") in response to hypothetical questions, that Bentley-Clearwood is not capable of performing her past relevant work as a customer service representative. (Tr. 25). At Step Five, the ALJ concluded that, considering her age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Bentley-Clearwood can perform at the light level, including garment sorter (200,000 jobs) and inspector (830,000 jobs) and at the sedentary level, including final assembler (200,000 jobs) and nut sorter (450,000 jobs). (Tr. 26). As a result, the ALJ concluded that Bentley-Clearwood is not disabled under the Act. (Tr. 27).

### C. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence

5

also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

## D. Analysis

In her motion for summary judgment, Bentley-Clearwood argues that the ALJ erred in: (1) failing to consider Listing 3.02; (2) evaluating the opinion evidence (and whether opinion evidence submitted to the Appeals Council was new and material); and (3) considering her subjective symptoms. (Doc. #15). Each argument is addressed below.

### 1. The ALJ Did Not Err in Failing to Evaluate Whether Listing 3.02 Was Met or Medically Equaled

Bentley-Clearwood argues that the ALJ erred at Step Three by not evaluating her physical condition under Listing 3.02, when evidence in the file reflected that her COPD met or equaled that Listing. (Doc. #15 at 9, 10). At Step Three, an ALJ considers whether the claimant has an impairment that meets the criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.920. Bentley-Clearwood bears the burden of proving at Step Three that her impairments meet or medically equal a particular listing. *See Bingaman v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 642, 645 (6th Cir. 2006) ("Plaintiff bears the burden of establishing that [she] satisfies the requirements of a listed impairment."); *Gower v. Comm'r of Soc. Sec.*, No. 13-14511, 2015 WL 163830, at *26 (E.D. Mich. Jan. 13, 2015). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed.Appx. 411, 414 (6th Cir. 2011). "A claimant must satisfy all of the criteria to meet the listing," *Rabbers*, 582 F.3d at 653, and all of

these criteria must be met concurrently for a period of at least twelve continuous months. *See* 20 C.F.R. §§ 404.1509, 404.1525(c)(3)-(4); 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(D) ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); *see Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc. Sec. Admin.*, 118 Fed.Appx. 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").

Bentley-Clearwood asserts in her summary judgment motion that she meets the requirements of Listing 3.02, which relates to "chronic respiratory disorders due to any cause except CF with A, B, C, or D."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02.  Specifically, she points to one set of FVC test results dated March 7, 2014 (Tr. 243) suggesting she met the Subsection (A) criteria, which required her to show that she had an $FEV_1$ less than or equal to 1.25 based on her age and height without shoes. *Id.* at § 3.02(A). [1]

The explanatory notes preceding Listing 3.02, however, explain the "requirements for an acceptable test and report" to demonstrate a valid $FEV_1$ score for purposes of the Listing.  These notes provide, in relevant part:

> Spirometry, which measures how well you move air into and out of your lungs, involves at least three forced expiratory maneuvers during the same test session.  A forced expiratory maneuver is a maximum inhalation followed by a forced maximum exhalation, and measures exhaled volumes of air over time.  The volume of air

---

[1] There is some dispute in the parties' briefs over Bentley-Clearwood's height and the relevant corresponding FEV1 level.  For purposes of this Report and Recommendation, the Court accepts as true her testimony that she is 5'4" in height (Tr. 45) and confirms that for a female of her height and age, the relevant FEV1 level is 1.25. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02.

> you exhale in the first second of the forced expiratory maneuver is the $FEV_1$…. We use your highest $FEV_1$ value to evaluate your respiratory disorder under 3.02A, 3.03A, and 3.04A, and your highest FVC value to evaluate your respiratory disorder under 3.02B, regardless of whether the values are from the same forced expiratory maneuver or different forced expiratory maneuvers.

*Id.* at § 3.00(E)(1). The notes set forth other requirements for the spirometry test, including that the claimant be "medically stable," and also establish certain requirements for the content of a report of test results. *Id.* at § 3.00(E)(2)-(3). Importantly, the notes require that "if your FEV1 is less than 70 percent of your predicted normal value, we require repeat spirometry after inhalation of a bronchodilator to evaluate your respiratory disorder under these listings . . ." *See also Basham v. Comm'r of Soc. Sec.,* No. 3:17-CV-635-CHL, 2019 WL 1382497, at *3–4 (W.D. Ky. Mar. 27, 2019).

Here, while Bentley-Clearwood notes an $FEV_1$ level in the record that she claims meets Listing § 3.02(A) requirements for a person of her age, gender, and height without shoes, she did not point to any corresponding evidence that the test complied with the specifications set forth in the Listing. Moreover, the Court's review of the lone medical record on which Bentley-Clearwood relies to support her position confirms that the test in fact did not comply with the required specifications. Indeed, the report states specifically, "Caution: Only One Acceptable Maneuver – Interpret with Care." (Tr. 243). Because Bentley-Clearwood has failed to point to evidence in the record of a spirometry test satisfying the Listing's requirement, she has not demonstrated she met Listing 3.02. *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725 at 728.

Moreover, an ALJ is not required to address every listing in his or her findings. *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. App'x 639, 641 (6th Cir. 2013). If "the record 'raises a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing." *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also*

*Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. App'x 426, 432 (6th Cir. 2014).  A "substantial question" requires the claimant to "point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the listing." *Smith-Johnson*, 579 Fed App'x at 432. Without such evidence, the ALJ "does not commit reversible error by failing to evaluate a listing at Step Three."  *Id.* at 433.  As explained, Bentley-Clearwood has not met her burden here, and there was not a substantial question requiring the ALJ to consider Listing 3.02.  Indeed, the ALJ noted that Bentley-Clearwood's breathing issues were controlled by medication, and that those conditions never required emergency room or urgent care visits.  (Tr. 25).  It was also noted that Bentley-Clearwood continued smoking despite her alleged breathing difficulties.  (*Id.*).  And, the test on which Bentley-Clearwood relies was administered in March 2014; not only was that two years before Bentley-Clearwood's alleged onset date, but it also took place while she was working. (Tr. 243).  As the ALJ noted, in discussing these facts, Bentley-Clearwood "stopped working because her position was eliminated, not due to any impairment." (Tr. 25).  Accordingly, the Court rejects Bentley-Clearwood's argument that the ALJ erred in failing to consider this Listing.

### 2.  *The ALJ Did Not Err in Evaluating the Opinion Evidence*

In formulating Bentley-Clearwood's RFC, the ALJ considered and relied upon several medical opinions.  He assigned relative weight to each opinion, explaining his reasoning, and ultimately, declined to give controlling weight to any opinion.  He considered medical opinions from the following doctors:  Jai Prasad, M.D., consultative examiner; Gayle Oliver-Brannon, Ph.D.; Thomas Horner, Ph.D., consultative examiner; state agency consultant B.D. Choi, M.D.; and state agency consultant Jerry Csokasy, Ph.D.  The ALJ's handling of these opinions is supported by substantial evidence.

### a.  *Dr. Prasad*

The ALJ gave some weight to Dr. Prasad's opinion that Bentley-Clearwood would not be able to squat or rise from a squat, stating, "the claimant's obesity could limit her ability to squat, but it does not appear that the maneuver was attempted during the exam." (Tr. 25, 228). Bentley-Clearwood asserts that the ALJ "essentially reject[ed]" that Dr. Prasad "performed a detailed examination" and relied on his own lay assessment of the record in formulating the RFC. (Doc. #15 at 14). Specifically, she takes issue with the ALJ's observation that it did not appear that she had attempted a squatting maneuver during the exam with Dr. Prasad. (*Id.*). Bentley-Clearwood contends that the ALJ should have included a squatting prohibition in her RFC, and that had the ALJ done so, she may not have been able to perform the jobs identified by the VE. Her argument fails, though, as the ALJ's analysis is supported by numerous pieces of evidence.

In the introduction of his report, Dr. Prasad noted that Bentley-Clearwood was there "for alleged disability due to depression, anxiety, panic attacks, obsessive-compulsive disorder, asthma and high blood pressure," none of which are impairments that might cause a squatting limitation. (Tr. 224). Dr. Prasad noted that Bentley-Clearwood had "[N]o joint pain, no muscle pain, no back pain, [and] no difficulty in walking." (Tr. 225). Dr. Prasad noted that she could walk a few blocks and climb a flight of stairs. (Tr. 226). He also observed that she "has a normal gait" and "[n]o sensory or motor deficits." (*Id.*). Dr. Prasad concluded, "Her main problem remains psychiatric, as her other problem remains the asthma and respiratory problem." (Tr. 227). Again, Dr. Prasad made no mention of Bentley-Clearwood having a "squatting" problem, or any other issue that would result in a squatting problem. Bentley-Clearwood bears the burden of showing that she suffers from impairments greater than those determined by the ALJ, *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008), and she points to no other record evidence indicating that she had a squatting problem or restriction. Finally, Bentley-Clearwood does not effectively

respond to the Commissioner's citations to the Dictionary of Occupational Titles for her argument that "the jobs identified by the [VE] do not appear to require the ability to crouch or squat." (Doc. #17 at 14-15). For all of these reasons, the ALJ's decision not to include a prohibition on Bentley-Clearwood's ability to squat was supported by substantial evidence.

### b. *Dr. Oliver-Brannon*

Dr. Oliver-Brannon diagnosed major depressive order and generalized anxiety disorder. (Tr. 301). The ALJ gave some weight to Dr. Oliver-Brannon's opinion that Bentley-Clearwood's mental issues "could 'cause her impairment and decompensation in occupational and other areas of functioning.'" (Tr. 25, 298). In according Dr. Oliver-Brannon's opinion this weight, the ALJ noted that the opinion (which is somewhat vague in that expresses only a potential impact on Bentley-Clearwood's functioning) "does not discuss any specific symptoms or limitations," and then essentially agreed with the opinion, writing, "[Dr. Oliver-Brannon's] finding that the claimant's mental impairments and symptoms could affect her ability to work and possibly cause her to decompensate *is consistent* with the records reflecting depression and anxiety" and that "these symptoms are adequately accounted for in the [RFC]." (*Id*.) (emphasis added). Bentley-Clearwood appears to take issue only with this latter finding. (Doc. #15 at 11-12, 14-15).

As a preliminary matter, it is well-established that when evaluating the claimant's RFC, the ALJ is not required to base her RFC findings entirely on a physician's opinion. *See, e.g.*, *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401-02 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ.") (citing *Shepard v. Comm'r of Soc. Sec.*, 705 Fed.Appx. 435, 442–43 (6th Cir. 2017) ("An RFC is an 'administrative finding,' and the final responsibility for determining an individual's RFC is

11

reserved to the Commissioner.")).  Instead, "[i]n formulating a residual functional capacity, the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions.").  *Mokbel-Aljahmi*, 732 F. App'x. at 399-401.  Here, particularly considering the vagueness of Dr. Oliver-Brannon's opinion, her records support the ALJ's RFC finding.

In a Biopsychosocial Assessment performed by Dr. Oliver-Brannon on September 6, 2016[2], which was ***five months after*** Bentley-Clearwood's amended alleged onset date, Dr. Oliver-Brannon noted that Bentley-Clearwood presented as pleasant, with organized thought process, fluent speech, normal impulse control and concentration, full orientation, and intact memory, judgment and insight.  (Tr. 299-300).  Her prognosis was "good," and it was noted that her hobbies included painting and gardening.  (Tr. 300-01).  Bentley-Clearwood saw Dr. Oliver-Brannon about 25 more times over the next year.  Although, as the ALJ recognized, there were times when Bentley-Clearwood appeared with mood issues and had "passive suicidal ideations," other times, the notes reflected that she had an "improved," "uplifted," and/or "stable" mood.  (Tr. 24, 306,

---

[2] This Biopsychosocial Assessment appears to be from Bentley-Clearwood's *first* appointment with Dr. Oliver-Brannon, which took place on September 6, 2016.  (Tr. 299-302, 304).  While the last three pages of this four-page Assessment are also dated September 6, 2016 (Tr. 300-301), the first page appears to be dated September 16, 2017 (Tr. 299).  That date clearly seems to be in error.  The Assessment records information much like an "intake" form would, and the "Activity Log" which shows all of Bentley-Clearwood's appointments begins on September 6, 2016, and ends on August 29, 2017.  (Tr. 304-05).  The ALJ addressed this Assessment as if it took place in September 2017 (Tr. 24) ("At a September 2017 assessment, the claimant said . . ."), and the Commissioner cites this record for the proposition that Dr. Oliver-Brannon "found that by September 2017, Plaintiff's concentration was normal and her memory was intact."  (Doc. #17 at 16).  Bentley-Clearwood also cited to the first page of this Assessment as if it took place in September 2017, though she later makes a vague reference to the ALJ having "the dates incorrect."  (Doc. #15 at 5, 17).  Regardless, the issue is at most harmless error because the ALJ evenly discussed the records of Bentley-Clearwood's appointments with Dr. Oliver-Brannon, including ones favorable to Bentley-Clearwood's position, and *agreed* that those records support the doctor's opinion that Bentley-Clearwood's "current psychiatric issues could cause her impairment and decompensation in occupational and other areas of functioning."  (Tr. 24, 298).

307, 310, 315).  In December 2016, when Bentley-Clearwood's mood had been found "uplifted" and "stable," Dr. Oliver-Brannon scheduled her next appointment for three weeks out.  (Tr. 310). Similarly, in June 2017, Bentley-Clearwood presented with an appropriate appearance, a stable mood with organized thoughts, and reported that she "felt good."  (Tr. 315).  It appears from the treatment note that Bentley-Clearwood reported attending her son's high school graduation, and had progressed by setting healthy boundaries with family and friends.  (*Id.*).  Again, she was scheduled to return three weeks later.  (*Id.*).  Records also showed that on many instances where Bentley-Clearwood presented with a depressed mood, it would become "improved" or "uplifted" by the end of the treatment session.  (Tr. 307, 308, 309, 311).  The ALJ also appropriately noted that "the record does not provide evidence of any episodes of decompensation or inpatient treatment."  (Tr. 25).  And, he also noted that Bentley-Clearwood "stopped working because her position was eliminated, not due to any impairment."  (*Id.*).

In short, the ALJ recognized the significant mental health issues that Bentley-Clearwood was facing as evidenced by Dr. Oliver-Brannon's records, but reasonably concluded that the record showed her impairments were "adequately accounted for in the [RFC]," which included numerous significant limitations, such as "simple, unskilled work with a [SVP] of one or two with occasional contact or discussion with coworkers or the general public; limited to routine work that does not require changes or adaptations in work settings or general duties more than once per month; and limited to jobs without production quotas mandating a specific number of pieces per hour, or with a down line coworker depending on her productivity."  (Tr. 21).  Bentley-Clearwood does not cite to evidence supporting greater limitations.  *Jordan*, 548 F.3d at 423.

### c.  Dr. Horner

Dr. Horner diagnosed depression, major recurring type and opined that Bentley-

Clearwood's abilities in the following domains were intact:  her ability to relate to others, understand, remember and carry out familiar or customary tasks, to focus and sustain attention to relevant and customary occupational tasks, to withstand or otherwise cope with the stresses of ordinary or customary occupational activity except as affected by anxiety.  (Tr. 235).  The ALJ assigned Dr. Horner's opinion some weight, appropriately noting that Bentley-Clearwood "was able to answer most exam questions, and was able to sustain focus and concentration during the exam."  (Tr. 24-25).  Nevertheless, the ALJ imposed *greater* restrictions in determining Bentley-Clearwood's RFC, finding that "the records reflect[] consistent complaints of depression and anxiety" and her "testimony regarding her symptoms support a need for limitations regarding workplace changes, production standards, and interaction with others."  (Tr. 25).  In particular, the ALJ limited Bentley-Clearwood to "simple, unskilled work . . . with occasional contact or discussion with coworkers or the general public; limited to routine work that does not require changes or adaptations in work settings or general duties more than once per month; and limited to jobs without production quotas mandating a specific number of pieces per hour, or with a down line coworker depending on her productivity."  (Tr. 21).  While Bentley-Clearwood argues, "[i]t is unclear what in the ALJ's RFC accommodates her 'anxiety states'", the Court disagrees; the limitations just noted speak to that issue.  Moreover, Bentley-Clearwood has not identified evidence in the record that would require even greater RFC limitations.  *Jordan*, 548 F.3d at 423.

### d.  Dr. Choi

Dr. Choi opined that Bentley-Clearwood "was capable of light work; could occasionally climb, balance, stoop, kneel, crouch, and crawl; and had no manipulative, visual, communicative, or environmental limitations."  (Tr. 74-75).  The ALJ gave Dr. Choi's opinion limited weight, stating that, although Bentley-Clearwood was capable of light work, her "obesity, respiratory

impairments, and respiratory symptoms support a finding of additional limitations, including environmental restrictions, avoidance of hazards, and an inability to climb ladders or scaffolds." (Tr. 26). The ALJ went on to include greater limitations than imposed by Dr. Choi, which decision Bentley-Clearwood does not seem to contest. (Tr. 21) ("claimant cannot use ladders or scaffolds. She must avoid [certain environmental exposures] . . . [and] cannot work with hazards . . .").

     *e. Dr. Csokasy*

     Finally, the ALJ noted that Dr. Csokasy opined that Bentley-Clearwood was moderately limited in her abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the public; accept instruction and criticism from supervisors; and get along with coworkers/peers without distracting them or exhibiting behavioral extremes."[3] (Tr. 25, 75-76). The ALJ found this opinion to be "consistent with the treatment records reflecting depression and anxiety, and with the limitations of the residual functional capacity." (Tr. 25). Bentley-Clearwood's argument is essentially that, having found Dr. Csokasy's findings to be "consistent" with the treatment records, the ALJ needed to adopt the doctor's limitations verbatim. (Doc. #15 at 20).[4] But that is simply not the law. The ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding ...." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (internal

---

[3] Actually, however, Dr. Csokasy found that Bentley-Clearwood was "not significantly limited" in her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (Tr. 76). Dr. Csokasy also found that she was "not significantly limited" in her abilities to "work in coordination with or in proximity to others without being distracted by them"; "to ask simply questions or request assistance"; and to "maintain socially appropriate behavior . . ." (Tr. 75-76).

[4] For instance, Bentley-Clearwood points out that Dr. Csokasy found that she was limited to "minimal" contact with others, whereas the ALJ limited her to "occasional" contact with coworkers and the general public. (Tr. 21, 76).

citations omitted).   Rather, the ALJ was required to evaluate all relevant medical and other evidence, consider what weight to assign to the various medical opinions, and then determine an RFC based on all of that evidence  *Mokbel-Aljahmi*, 732 F. App'x. at 395, 399-401.  Here, Bentley-Clearwood focuses *only* on the fact that a few "records are noting unstable depression with suicidal ideations" (Doc. #15 at 17), whereas the ALJ's RFC is based on those records, *as well as* all of the other evidence in the record, as discussed herein.  Nothing in the ALJ's evaluation of Dr. Csokasy's opinion merits remand.

*f.   Dr. Oliver-Brannon's February 2018 Letter*

In arguing that the ALJ erred in evaluating Dr. Oliver-Brannon's opinion evidence, Bentley-Clearwood also relies on a February 20, 2018 letter from Dr. Oliver-Brannon which is characterized as "an appeal to the Social Security Administration" and states that Bentley-Clearwood "remains overwhelmed by her psychiatric condition," including "social anxiety, suicidal ideations and attempts."  (Tr. 12).  The letter further states that Bentley-Clearwood is "likely to have significant difficulty engaging and maintaining consistent employment" and "does not present as an appropriate candidate for employment."  (*Id.*).  Bentley-Clearwood's reliance on this letter is problematic for several reasons, however.  This letter post-dates the ALJ's January 25, 2018 decision and, therefore, was not before the ALJ at that time.  Logically, such evidence cannot be considered for purposes of substantial evidence review.  *See Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir.1993) (where the Appeals Council denies review of the ALJ's decision, evidence first submitted to the Appeals Council cannot provide a basis for deeming the ALJ's decision unsupported by substantial evidence).  The only context in which this Court may consider such post-decision evidence, is to determine whether it merits remand pursuant to sentence six of 42 U.S.C. § 405(g).  Under sentence six, in order for a case to be remanded to the ALJ for

consideration of new evidence, the evidence must be material, and good cause must be shown as to why it was not presented at the prior proceeding.  *See* 42 U.S.C. § 405(g); *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (6th Cir.1984).  Here, Bentley-Clearwood has offered no justification for her failure to submit this evidence sooner.  And, indeed, where Dr. Oliver-Brannon was Bentley-Clearwood's treating physician beginning in September 2016, it is difficult to see why Bentley-Clearwood could not have obtained such evidence prior to the administrative hearing.

Moreover, and perhaps even more importantly, Bentley-Clearwood has not established that Dr. Oliver-Brannon's letter is material.  The Sixth Circuit has held that for new evidence to be material there must be "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence."  *Sizemore v. Sec'y of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir.1988).   Here, Dr. Oliver-Brannon's February 20, 2018 letter appears cumulative of the same doctor's prior similar opinion from a few months earlier, which the ALJ did consider, as discussed above.  (Tr. 25).  The Court also notes that the letter was unaccompanied by any new treatment records not before the ALJ.  To the extent the letter contains additional conclusions – for instance, Dr. Oliver-Brannon wrote that Bentley-Clearwood's ability to understand and remember instructions and perform work like procedures may also be restricted by her "vision limitations and medical concerns" (Tr. 12) – such functional restrictions are outside Dr. Oliver-Brannon's area of expertise.  And, the ALJ specifically relied on Dr. Csokasy's opinion that notwithstanding Bentley-Clearwood's prosthetic eye, she was "not significantly limited" in her ability to understand and carry out very short and simple instructions, to perform activities within a schedule, or to sustain an ordinary routine without special supervision.  (Tr. 75-76).  Therefore, Bentley-Clearwood has not shown a "reasonable probability"

that the ALJ would have evaluated Bentley-Clearwood's condition differently if presented with this particular letter.

For all of the above reasons, Bentley-Clearwood's argument that the ALJ erred in evaluating the opinion evidence lacks merit.

### 3.   The ALJ Properly Analyzed Bentley-Clearwood's Subjective Symptoms

Noting that Bentley-Clearwood alleges disability due to depression, anxiety, and breathing issues related to COPD and asthma, the ALJ proceeded to conclude:

> … the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision.  Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.
> …
>
> In sum, it is found that the record does not provide evidence of any impairment or combination of impairments that render the claimant unable to work.  It is noted throughout the record that the claimant stopped working because her position was eliminated, not due to any impairment.  It appears that the claimant's breathing issues are controlled with medication.  The record does not contain evidence of any exacerbations, or emergency department or urgent care visits for breathing issues.   The claimant continued to smoke despite her alleged breathing difficulties. It appears that the claimant's hypertension is also controlled by medication.  She did not report any related symptoms.   The claimant has not treated with a cardiologist or pulmonologist.  It does not appear that the claimant's right eye loss has a significant effect on her ability to function.  She lost the eye in childhood and was able to work despite the issue for many years.  The claimant did continuously allege depression and anxiety, but the record does not provide evidence of any episodes of decompensation or inpatient treatment. It is found that the mental limitations of the residual functional capacity adequately account for the claimant's symptoms.

(Tr. 23-24, 26).

Bentley-Clearwood asserts, in the most conclusory fashion, that the ALJ's subjective symptom analysis is flawed for several reasons.  Specifically, she asserts it is flawed because his

conclusion that she stopped working because her position was eliminated is inconsistent with the statement on her application that she stopped working as a result of her conditions, there is clear evidence in the record of her breathing deficits, it seems implausible that the loss of her eye would not present a limitation, and her lack of hospitalizations or inpatient treatments cannot be found to undermine the severity of her mental impairments.  (Doc. #15 at 18-20).  Given her cursory treatment of these issues, her arguments, not surprisingly, are underdeveloped.  The Court has deemed similarly underdeveloped arguments waived.  *Berry v. Comm'r of Soc. Sec.*, No. 16-10548, 2016 WL 7664225, at *11 (E.D. Mich. Dec. 8, 2016), *report and recommendation adopted*, No. 16-10548, 2017 WL 67458 (E.D. Mich. Jan. 6, 2017).  Nevertheless, Bentley-Clearwood's primary argument appears to be that the ALJ erred in attaching significance to her lack of hospitalizations or in-patient treatment when considering the severity of her mental impairment.  She contends, relying on *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015), that just because she does not require such treatment measures, that does not mean she is able to obtain and sustain gainful employment and, therefore, is not disabled.

To begin with, the Sixth Circuit has held that ALJs are in the best position to evaluate a claimant's subjective complaints because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.' " *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Rather, after the ALJ finds a medical condition that could reasonably be expected to produce the

claimant's alleged symptoms, he must evaluate the claimant's symptoms by considering "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). In making such an adjudication, a "single, conclusory statement" asserting consideration of the individual's symptoms or reciting the factors in the regulations is insufficient. *Id.* at *9. Instead, "[t]he determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* In his decision, the ALJ properly set forth the two-part regulatory standard for evaluating a claimant's subjective complaints. (Tr. 20). And, in considering Bentley-Clearwood's subjective allegations, the ALJ discussed her hearing testimony and other statements regarding her symptoms; her medication and side effects; her treatment history; and her daily activities. (Tr. 21-25).

The ALJ's finding that Bentley-Clearwood stopped working for reasons other than her impairments is well-supported by the record. First, she told Dr. Horner that she had stopped working when her position was eliminated. (Tr. 234). Similarly, she told Dr. Oliver-Brannon that she had been unemployed since her position was eliminated. (Tr. 299). Further, her counsel explained at the hearing that she had lost her job due to staffing reductions. (Tr. 38). Finally, she testified at the hearing that she was laid off permanently when her job "went away." (Tr. 52).

With respect to Bentley-Clearwood's subjective complaints regarding her breathing impairments, the ALJ also properly considered the medical evidence of record. *See* 20 C.F.R. § 404.1529(c)(4). Specifically, the ALJ found Bentley-Clearwood's COPD and asthma to be severe

impairments.  As a result, he formulated the RFC to require that she avoid "concentrated exposure to extreme heat, extreme cold, wetness, humidity, vibrations, fumes, odors, dust, gases and poor ventilation."   These restrictions appear to adequately accommodate Bentley-Clearwood's breathing conditions and she has not specifically argued otherwise.  She has not cited to portions of the medical record establishing her need for further restrictions, apparently leaving it to the Court to determine which further restrictions might be appropriate.  However, she may not raise an argument in the "most skeletal way," leaving it to the Court to put meat on the legal bones. *Berry*, at *14, citing *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997).

Bentley-Clearwood's challenge relating to the loss of her eye fails for the identical reason. The ALJ's finding that she could work despite her eye loss is well-supported by the record.  (Tr. 159).  Bentley-Clearwood lost her right eye when she was six years old and wears a prosthetic eye. (Tr. 40, 50, 51).  She testified to experiencing some depth perception issues as she has gotten older with "most surfaces appear[ing] flat."  (Tr. 50).  Despite having lost her eye at such a young age, she provided evidence of a lengthy work history.  Beginning with her Disability Report, Bentley-Clearwood stated that she worked from September 1994 to April 1999, November 2003 to May 2005, and January 2007 through January 2016.  (Tr. 159).  Her Work History Report confirmed that she worked during these time periods and also worked from 1987-1993 and 2002-2003.  (Tr. 164).  Her work duties as described (using a computer, generating reports, waiting tables) required some degree of vision.  (Tr. 165-167, 170).  The RFC restricted Bentley-Clearwood from work using "ladders or scaffolds" or  working "with hazards including dangerous/unprotected machinery" or working at "unprotected heights."  (Tr. 21).  Again, she has failed to identify any additional visual limitations that should have been included in the RFC, so she has failed to demonstrate the ALJ's error.

Finally, the Court finds Bentley-Clearwood's reliance on *Voigt* to be misplaced and unpersuasive. Nothing in the ALJ's decision suggests that evidence of her hospitalizations or inpatient treatment was necessary in order to establish disability. A fair reading of the ALJ's decision demonstrates that, in making reference to such levels of treatment, the ALJ merely was evaluating her subjective complaints and not suggesting the nature of required treatment. Moreover, the ALJ found Bentley-Clearwood's affective disorder/depression and anxiety disorders to be severe and accounted for them in formulating the RFC.

In sum, in assessing Bentley-Clearwood's credibility and the effects of her impairments, the ALJ fairly and properly considered the record evidence, including her medical records, statements and activities of daily living. The Court finds no reason to disturb the ALJ's evaluation of Bentley-Clearwood's subjective complaints because the ALJ observed her firsthand, and his assessment is supported by substantial evidence in the record. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.").

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #17**) be **GRANTED**, Bentley-Clearwood's Motion for Summary Judgment (**Doc. #15**) be **DENIED**, and the **ALJ's** decision be **AFFIRMED**.

Dated: June 3, 2019                                                    s/David R. Grand
Ann Arbor, Michigan                                            DAVID R. GRAND
                                                                            United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 3, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

23